JOSEPH SEIFER and Another, Plaintiffs, *v.* ISIDOR SCHWIMMER, President of the Congregation Agudas Chaverin Anshei Marmoras, and Another, Defendants.

Supreme Court, Trial Term, New York County, March 16, 1937.

*Abraham J. Halprin,* for the plaintiffs.

*Samuel Stern,* for the defendants.

SCHMUCK, J. Plaintiffs seek to restrain the defendants from interfering with the disinterment of the body of their father. Epitomizing the facts elicited at the trial, it appears that the father of the plaintiffs was buried in 1905 in a consecrated plot owned by the

defendants in a distinctively Jewish cemetery.  In his lifetime the decedent was extremely religious and adhered rigidly to the tenets of the orthodox Jewry.  He was an organizer of the defendant and had proved unfailing in his support of it.  At his death he was buried in the consecrated plot of his organization, probably in accordance with his request oft expressed during life, but certainly without any objection on the part of his widow.  At the time of his death there was no other place available to him.  Some twelve years after his death his widow purchased a one-half interest in a lot of eight graves situate in an equally distinctive Jewish cemetery and in which she was buried after her death, in 1936.  Accrediting to the testimony its legal worth, it appears, since plaintiff Joseph Seifer so testified and which testimony remained uncontradicted, that the widow of the one whose body is sought to be exhumed repeatedly asserted the wish to be buried in a grave contiguous to that of her husband.  No effort was made to satisfy this devout and natural wish by removal of the body of the father during the lifetime of the mother of these plaintiffs because of the fear of the effect thereof on her, she being a sufferer from hypertension.  No effort was made to do so after her death, so far as the plot of the defendant is concerned, because, she not being a member, it inevitably would have been futile.  Now, however, that she sleeps in her last mortal bed, her children are anxious to comply with the hope she frequently expressed by placing whatever remains of their father next to the remains of the one whose devotion and love in life warrant, symbolically, non-separation in death.  In opposition to what would ordinarily be accepted as sentimentally laudable, the defendant urges consideration of the effect disinterment in this case would have upon the sacredness and orthodoxy of their burial plot.  At this point, in justice to the defendant, it is well to note that the objection interposed by it is not born of arrogance, arbitrary and unreasonable exercise of privilege, or embittered prejudice causing indefensible desire to displease rather than to favor.  Fearing desecration by exhumation and the effect thereof on the rest of the plot, the defendant is honestly antagonistic to the disinterment of the body of the plaintiffs' parent.

It is, therefore, necessary to determine, in view of the defendant's opposition, whether, all other elements being favorable, an objection based on ecclesiastical law is sufficient to sway the mind of equity.  To a query of this character the answer generally must be in the negative.  Since ecclesiastical law is not part of the law of the State, equitable rights are not to be determined in accordance therewith.  In *Cohen* v. *Congregation Shearith Israel* (114 App. Div. 117, 119) we are taught that: " Ecclesiastical law is not a part of the law of this State, nor are equitable rights to be determined by it; on the

contrary, when a court of equity exercises its powers, it does so only upon equitable principles, irrespective of ecclesiastical or any other law." This, however, does not mean that religious usages are to be totally disregarded, for as was declared in *Yome* v. *Gorman* (242 N. Y. 395, 403): " Subordinate in importance, and yet at times not wholly to be disregarded, are the sentiments and usages of the religious body which confers the right of burial." We may not and will not, therefore, entirely discard the religious aspect of the question herein involved and decide it on purely secular grounds. Searching the testimony to inform ourselves of the religious belief, rites and ceremonials of the principals herein, we learn that all concerned were and are Jews whose orthodoxy is of varying degrees. We discover that as a matter of pure religious law disinterment is a matter of grave consideration to Jewry and is abhorred as unthinkable desecration, except under certain circumstances. With this conception ready agreement is had, for to all civilized creeds the disturbance of the body of one who sleeps beyond mortal power to awaken is abhorrent and vigorously resented. Nevertheless, conditions arise making it necessary or desirable to exhume a body and reinter it elsewhere. This fact is recognized even by the strictest, most ancient, controlling and inexorable law of orthodox Jewry. That creed accepts as one reason excusing exhumation the desire to place the remains of a human being among his own. The interpretation of this provision of Jewish law apparently is not unanimous, even among the orthodox. The startling difference of opinion expressed by the rabbis leaves the court in a quandary as to what the Code of Karo, more commonly known as the Schulchan Aruch, the oldest compendium of Jewish law, means by the doctrine of " u'besoch shelo " (among his own). Reference in extenso was had during the trial to an article written by an eminent Jewish scholar and rabbi anent the subject of disinterment. A study thereof does not dissipate the confusion regarding disinterment among orthodox Jews. Nor is any help to be had in accepting the advice of an ancient authority by asking a question of a rabbi when disinterment is sought. This was permitted at the trial and the result proved most discouraging, for one holy man said that to disinter the remains in question would be defilement, while the other confidently asserted that the proposed removal was entirely consistent with every requirement of orthodoxy.

While it is not indispensable to decide which of the proposed viewpoints is to be accepted as the correct interpretation and thus indirectly assume the power of defining ecclesiastical rule and regulation, yet it is assuring to know that even among the cognoscenti grave doubt exists as to whether, under circumstances herein prevailing,

disinterment would result in defilement. Reiterating the principle predicated at the outset that ecclesiastical law will not govern equity in resolving the problem presented, but that equitable principles must govern, the court, after having given appreciative and thorough consideration to defendant's qualms concerning the effect of this interment on this plot in general, to that part of the Code of Maimonedes concerning the defilement of the dead (Tumas Mais), to that portion of the Schulchan Aruch referring to the burial of the dead, maintenance of the grave, and disinterment, and to the judicial pronouncements on this subject, holds that on the peculiar circumstances of this matter the plaintiffs are not entitled to the relief solicited, for they have not complied with the rule laid down in *Matter of Ackermann* (124 App. Div. 684), wherein we find that from time immemorial it has been considered as a work of desecration to disturb the repose of the dead, and that only when superior private rights or controlling public reason advise such procedure will it be allowed. The court cannot disregard the fact that for more than thirty years the body of the deceased has quietly and undisturbedly rested in the grave and that beyond peradventure there is nothing now remaining which has not indistinguishably intermingled with the surrounding earth. Buried in a plain pine coffin which now has long since disintegrated beyond recognition, there cannot be anything left except a certain amount of bones out of alignment and which no longer have any resemblance to a human skeleton. Mildly characterized, it is unseemly to disturb the repose of the dead under these conditions. In the light of this circumstance only blind prejudice could justify the claim of a superior private right existing in this matter.

The conclusion arrived at in consequence of this investigation is that whatever remains of the remains of the paternal parent of these plaintiffs continue to stay peacefully in the spot presumptively selected by him in his lifetime and which selection must be considered paramount to all consideration. (*Matter of Donn*, 14 N. Y. Supp. 189.)

Finally, judgment is decreed the defendant because, while ecclesiastical law may not control equity, yet, mindful of the horror with which orthodox Jewry regards all exhumation, in the absence of a compelling reason for permitting what has always been considered a desecration abhorrent to the finer and humanitarian interests prevalent since the beginning of civilization, heed will be given to the religious inhibitions affecting the parties herein concerned. It is not a matter of absolute right to disinter the remains of the dead. (*Yome* v. *Gorman*, 242 N. Y. 395.) Nor are the wishes of wife and children superior in this respect whether the body be buried or

unburied. (*Matter of Ackermann, supra; Pettigrew* v. *Pettigrew*, 207 Penn. St. 313; 56 A. 878.) As a final word, the court fails to find so unusual and unique an emergency as warrants a court of equity to take these remains from the grave even to satisfy the natural desire inducing this application.

Submit judgment accordingly. No costs.