Plaintiff, Mrs. Leila Bradley Burgis, is the widow of Dr. Albert F. Burgis, who died in New Orleans on October 22, 1943. Defendant, Edward W. Burgis, domiciled in the city of New Orleans, is the father of plaintiff's deceased husband.
Plaintiff seeks to compel defendant to permit the removal of the body of her said husband from the burial plot of defendant in a cemetery in the Parish of Jefferson, in which plot it was interred shortly after death. She desires to remove it to another burial place owned by her in the same cemetery. She alleges that at the time of her husband's death she had no plot or tomb of her own and was financially unable to obtain one and that, therefore, because of necessity, she was compelled to permit her husband's father, the present defendant, to make all arrangements for the funeral and to bury her husband in a plot belonging to his said father. She alleges too that the said defendant "assumed complete charge of the burial arrangements" and that the said burial plot in which he was interred was owned and dominated by defendant."
She also alleges that she "was obliged to permit the aforesaid interment, she, in her bereavement, preferring not to engage in a controversy under such sad auspices with defendant, in view of his deep-seated hostility towards her * * *." She avers too that she has now purchased "a suitable and desirable tomb" but that in spite of her request, her said father-in-law, defendant, refused to permit the removal of the remains of her husband, advising her that "any attempt on the part of anyone to remove them will be vigorously opposed."
She charges "that defendant and all the members of defendant's family, as well as decedent's first wife, have a deep and insatiable hatred for your petitioner, which they have no hesitancy in displaying at all times and in all places." She further alleges "that neither defendant nor any of the members of his family, even speak to your petitioner, so great is their animosity to her." She avers that the "hatred and enmity" of her husband's father were evidenced by the fact that when she had a grave marker made with Dr. Burgis' name and the word "Husband" on it, the defendant deliberately turned this marker around so that the inscription on it could not be seen.
In another allegation she avers that she "cherished the hope, that, upon her own demise, she will be buried in the same last resting place as her own devoted husband, * * * " and that "she will be deprived of this great consolation so long as decedent's mortal remains are in their present burial place." *Page 755 
Defendant filed an exception to the jurisdiction (ratione materiae), and when this exception was overruled he filed answer in which he averred that for lack of information he could neither admit nor deny that plaintiff and her said husband had been married. He denied that he had assumed charge of the funeral but averred that he had made the necessary arrangements and had caused his son's body to be interred in his family burial plot "only after the request was made of him by plaintiff." He further denied all of the allegations concerning hostility towards plaintiff, and especially averred that "he has purchased additional ground adjoining his original burial plot" and that plaintiff has been informed "that there would be reserved for her * * * a plot next to decedent, wherein the remains of plaintiff would be interred * * *," that "plaintiff has his full and irrevocable consent to be buried in said plot as long as the remains of his late son rest therein."
After a trial there was judgment in favor of plaintiff decreeing "that plaintiff herein is entitled to the possession of the mortal remains of her deceased husband * * *, and that defendant is hereby ordered to permit the removal from said burial place to the tomb presently owned by plaintiff * * * ".
Defendant has appealed devolutively and suspensively.
The exception (ratione materiae) to the jurisdiction of the Civil District Court for the Parish of Orleans is based on the theory that a corpse, once it is interred, becomes a part of the soil and that consequently a suit for its possession or removal involves soil or ground and is, therefore, a real action. This theory that the corpse becomes a part of the soil is recognized in Travelers Insurance Co. v. Welch, 5 Cir.,82 F.2d 799, 801, in which the U.S. Circuit Court of Appeals for the Fifth Circuit said: "There is no strict property in a corpse, and after burial it becomes a part of the ground to which it is committed."
Counsel contend that, since the corpse has become a part of the soil of the Parish of Jefferson, a suit involving it is a real action as provided by Articles 4 and 41 of our Code of Practice, and, therefore, must be brought in the Parish of Jefferson since it constitutes an exception to the general rule of Article 162 of the Code of Practice which, except in certain cases, "expressly provided for by law", requires that a suit be brought at the domicile of the defendant. That article, C.P. art. 162, reads as follows: "General rule — Defendant sued at domicile or residence. — It is a general rule in civil matters that one must be sued before his own judge, that is to say, before the judge having jurisdiction over the place where he has his domicile or residence, and shall not be permitted to elect any other domicile or residence for the purpose of being sued, but this rule is subject to those exceptions expressly provided for by law."
Under this general rule, the suit was required to be brought before the District Court of the domicile of the defendant who resides in the Parish of Orleans, unless it can be said that its subject matter makes it one of those "exceptions expressly provided for by law."
[1] Without finding it necessary to decide that question, we have studied the articles of the Code which provide exceptions to the general rule of Article 162. These exceptions are found in Articles 163, 164 and 165. We cannot say that any one of those exceptions clearly includes an action of this type. It is well established that where it is attempted to establish an exception to a general rule strict construction is required and the exception is not to be recognized unless it is clearly established. King v. Wm. J. Burns International Detective Agency, 151 La. 211, 91 So. 681.
But even if it be conceded that this action can be placed within the category of those exceptions which are expressly provided for, and even if it be conceded therefore that this is a real action under Article 41 of the Code of Practice and is thus covered by the provisions of Article 163 of the Code, which provides for the venue of real actions, still it would not have been necessary that the suit should have been brought in the parish in which the property was situated for that article clearly provides that the plaintiff had the option to bring the suit either in the parish in which the defendant has his domicile or in that in which the property is situated. The pertinent part of that article, C.P. art. *Page 756 
163, reads as follows: " * * * the defendant may be cited, whether in the first instance or in appeal, either within the jurisdiction where the property revendicated, hypothecated or provisionally seized or sequestered is situated or found, though he has his domicile or residence out of that jurisdiction, or in that where the defendant has his domicile, as the plaintiff chooses; * * *."
[2] As we have said, even if it be conceded that this is a real action, the above-quoted language of Article 163 of the Code of Practice clearly gave to the plaintiff the right to bring the action either in the Parish of Jefferson or in the Parish of Orleans. Reugger v. De Brueys, 146 La. 283, 83 So. 556. Plaintiff, having exercised her option and having brought suit at the place of defendant's domicile, defendant cannot complain. The exception to the jurisdiction ratione materiae was properly overruled.
The law on the question of the right of a surviving spouse to remove from one resting place to another the remains of a deceased husband or wife is discussed at length in Bunol v. Bunol, 12 La. App. 675, 127 So. 70, 71. That case was presented on exception of no cause of action, and the allegations of the petition which is now before us bear a striking resemblance to those which were in the petition in the Bunol case.
[3-5] We concluded there that " * * * whereas the surviving spouse is vested with the initial right of the selection of the place of sepulture of the deceased, the right to require subsequent removal of the remains does not exist, unless such removal is made necessary by unusual circumstances. * * * "
We found, however, that the right to remove said remains is only denied if the consent to the initial interment was given freely and with the understanding that the interment place selected was to be permanent, and that the right to remove such remains is recognized where, because of the circumstances, there could have been no other decision than to permit the initial interment to be made where it was made. We found also that many of the commentators and authors recognize that even where a surviving spouse has freely given consent to the initial interment there may be "meritorious" or "proper" circumstances under which the removal may be permitted.
Counsel for plaintiff, very obviously, has recognized that case (Bunol v. Bunol) as setting forth the law on the subject and has presented in behalf of plaintiff much evidence which he says shows, in the first place, that plaintiff's consent to the initial interment was not freely given, that she did not realize that the tomb of her father-in-law was being selected as the permanent resting place of her husband, and, in the second place, that even if that consent was freely given there have arisen since many circumstances which justify her demand for the removal of her deceased husband's remains to her own burial plot.
Let us see what the record shows on these two questions — first, was plaintiff's permission that her husband might be interred in his father's burial plot given freely, and under circumstances which indicate that she understood that that spot was being selected as his permanent resting place?
Let us also see whether, if she did so consent, she should nevertheless be permitted to effect the removal of her husband's remains on the ground that the occurrences since his original interment indicate that there has been exhibited towards her by the other members of her husband's family so much hostility as to justify her demand.
What were the circumstances surrounding the making of the funeral arrangements? Plaintiff says that on the day of her husband's death, his father came to her home for the first time and that he took complete charge of the funeral arrangements; that she made no objection, realizing that any protest would be futile. Defendant and other members of his family and the undertaker say that plaintiff was present when all of the arrangements were made, and that she took part in the discussions, though they all admit that defendant did most of the talking. He, himself, admits this, and, when asked: "Who made the arrangements with the funeral directors for the funeral of your son?" answered: "I did, directly." He followed this statement *Page 757 
with the explanation that he made the arrangements "at the request of my son's widow."
There are certain things about the testimony of defendant and about his attitude which are not consistent; for instance, as has just been quoted from his testimony, he says that he made the arrangements at the request of his son's "widow" and there is no doubt that he realized the importance of proving that the widow, herself, had consented to the interment, and yet in other parts of his testimony he admitted that at the time of the death of his son, and even for a long time afterwards, he had never considered the plaintiff as the widow of his son, had never believed that they were married and had always looked upon her as his son's "mistress". Another thing about his testimony, which is not convincing, is his pretended shock at realizing that he and other members of his family were being charged by plaintiff with being antagonistic to her. He said: "I am the most amazed man to find, I am accused of these horrible things in this cruel attack against the feelings and sentiments of my wife, myself and my family. It is a cruel attempt, a cruel thing; I cannot believe it yet that this lady entirely blamed such an attack upon our, — she had no reason to do it."
There was certainly no justification for his amazement for this entire record, as well as the records in the succession of his son and in the suit of his son's first wife against his son, all reek with evidences of his dictatorial manner, and a study of this record shows beyond any possible doubt the terrific antagonism which he had always exhibited towards the present plaintiff.
Nevertheless, we think that the record shows that the present plaintiff did agree, passively perhaps, but, nevertheless, with an understanding of what she was doing; that the funeral arrangements as made were satisfactory and that the burial plot of defendant was to be the final resting place of her deceased husband. The record shows too that though she was no doubt very much upset at the time, her mental condition was such that she was capable of realizing the importance of the decision which was being made. We reach this conclusion in spite of our realization that a contrary result was arrived at in Brake v. Mother of God's Cemetery, 251 Ky. 667, 65 S.W.2d 739. There, under circumstances which appear to us less harrowing than those which confront plaintiff in the case at bar, the court held that the widow of the deceased had not given that free and unrestrained consent which is necessary if the widow is to be denied the right to remove her husband's body because she has "consented" to its initial interment.
We pass then to a consideration of the evidence touching upon the hostility of plaintiff's father-in-law and his family towards plaintiff. It stands out clearly that her said father-in-law has a bitter hatred for her and has never failed to exhibit it openly. He, himself, admitted — we may say boasted, that even for some time after his son's death, he had never believed that his son had married plaintiff.
We have no doubt at all from the record that defendant has done all that he could to make it most unpleasant for plaintiff to visit the grave of her husband. While there is no positive proof on the subject, it seems almost certain that defendant was responsible for the reversing of the marker which plaintiff had had placed on the plot. She had had this marker inscribed with the name of the deceased and also the word "Husband". It is obvious that when defendant first saw this marker he was incensed because he telephoned to plaintiff to know if she was responsible for putting it there, and, when he discovered that she was, in an apparent rage, he broke off the telephone conversation. Shortly after this the marker was found reversed so that the side on which the word "Husband" was inscribed could not be read by persons standing in front of the tomb.
It also seems clear that defendant or some members of his family were responsible, on other occasions, for throwing out flowers and a potted plant, which had been placed on the plot by plaintiff.
[6] The record contains much evidence which shows the extent of this hostile feeling and we conclude that it would be almost impossible for plaintiff to visit her husband's grave with that peace of mind and *Page 758 
contentment which are so essential on such occasions. Is this sufficient to bring the case within the category of those in which it has been held that "unusual" or "meritorious" circumstances justify courts of equity in permitting remains of deceased persons to be removed? We commence with a realization that in cases of this kind, each must be determined on its own peculiar facts.
In 25 Corpus Juris Secundum, § 4, page 1020, under the title "Dead Bodies", we find the following: " * * * There is no universal rule applicable, each case depending on its own facts and circumstances; and for a valid reason, upon application by a proper person, the removal of a body will be permitted."
In American Jurisprudence Vol. 15, page 844, subject "Dead Bodies", we find the following: "Each case must be considered in equity on its own merits, having due regard to the interests of the public, the wishes of the decedent, the rights and feelings of those entitled to be heard by reason of relationship or association, the rights and principles of the religious body or other institution, which granted the right to inter the body at the first place of burial, and determining whether consent was given to the burial in the first place of interment."
We have looked into the facts of several of the cases, in each of which assistance of the courts has been sought in an effort to remove a body from one place of interment to another, our purpose being to find out just what facts have been found sufficient by other courts. We find that disinterment was refused in Seifer v. Schwimmer, 166 Misc. 329, 1 N.Y.S.2d 730. There the deceased had been buried for thirty years in a consecrated Jewish cemetery operated by a Jewish organization which the deceased had founded. His son sought to move the body to the grave of the son's mother who was buried in another Jewish cemetery. The court refused to permit the removal recognizing that the faith of the deceased looked with abhorrence upon disinterment. The court said that although ecclesiastical law is not a part of the law of the state and equitable rights are not to be determined in accordance therewith, nevertheless religious usages and rights should not be totally disregarded.
In Curlin v. Curlin, Tex.Civ.App., 1921, 228 S.W. 602, the court refused to permit the removal of an already interred body. At the time of the death of the husband, the wife was sick and unable to attend the funeral but directed his burial in the following manner: She had a casket selected under her direction and requested of the parents that the deceased be buried in a lot previously selected and purchased by him as a burial place for the family. She requested that space be reserved for her alongside the grave of her husband so that she could be buried there in due course. She requested removal because of an estrangement between herself and the deceased's mother. The court based its refusal to permit the removal on the fact that the widow had consented to the burial place in the first instance and had not shown sufficient reason for the removal.
In Puckey v. Blake, 306 Pa. 374, 160 A. 222, the deceased wife, at her request and with the consent of her husband, had been buried beside her father, and an infant son, who died later, had also been buried beside the deceased mother. Ten years later, because of mining operations under the cemetery, her body and those of the father's family were removed by the deceased's brother without consulting the husband as to the new cemetery to which, however, he had free access. Several years later the husband sought to have the bodies of his wife and son removed to a lot in another cemetery. The court refused to allow the removal.
In Stiles v. Stiles, 113 Mich. 576, 185 N.Y. S. 53, a father sought an injunction to prevent the removal of his son's body by his widow. The day after the death of the deceased, the father and the widow discussed the question of where the deceased should be buried and the widow expressed a desire to have her husband buried in her father's plot, to which the plaintiff objected and the deceased was buried in his father's plot. The widow was ill at the time and was suffering severely from the shock caused by the death of her husband. The court granted the injunction and refused to permit her *Page 759 
to remove the body. The court said that at least one day had passed since the death of her husband, and she knew that the grave had been selected and that she had been told of its location, and that she had been present at the burial.
In Sacred Heart of Jesus, P.N.C. Church v. Soklowski,159 Minn. 331, 199 N.W. 81, 33 A.L.R. 1427, the deceased had broken away from the Roman Catholic faith and had founded the Polish National Catholic Church in the cemetery of which he had been buried. It was shown that prior to his death he had called in a Roman Catholic priest and had been administered the last sacrament by that priest. The court held that the widow and children were prompted by religious convictions to desire the removal, and that because of the strong evidence that it was the final wish of the deceased that he be buried in the cemetery to which they desired to remove his body, this wish should be complied with.
In Brake v. Mother of God's Cemetery, supra, the husband died about a month after his marriage and was buried in a grave selected by his parents. Seven or eight months later the widow brought suit to remove the body to a grave nearer her home on the ground that it was not convenient to visit the tomb which was three hours journey from her home. She also showed friction between herself and her husband's parents regarding the upkeep of the cemetery lot. The court allowed the removal of the body saying that the parents had failed to produce evidence showing that the burial place to which the widow desired to remove her husband's body was in a fit or suitable place, and that they had not produced evidence to disprove the contentions of the widow as to the friction which had arisen between them. The court also said that though it was not shown that the widow had affirmatively objected to the selection of the first burial place, there was no proof that she had actively consented.
In Pettigrew v. Pettigrew, 207 Pa. 313, 56 A. 878, 64 L.R.A. 179, 99 Am.St.Rep. 795, about a year after the death of the deceased, a child of the deceased died. The child was buried in another cemetery purchased by the widow. The deceased had been buried in a lot belonging to his family and his burial had taken place there with his widow's consent though there was some dispute as to whether that consent contemplated that the place selected was to be anything more than a temporary resting place. The court did not decide that issue but found that there was no room in that plot for other members of the family and that there was considerable hostile feeling between deceased's brothers and sisters. The court permitted the removal.
[7] A reading of all of these cases, and many others, convinces us that even though in a case such as this, the widow may have given consent to the selection of the initial place of burial where, after that first interment, there have arisen conditions which make it practically impossible for the widow to visit the tomb without being constantly reminded of the terrific hostility towards her of the other members of her husband's family and without being subjected to the annoyance to which the plaintiff here was constantly subjected, she should be permitted to remove the remains of her husband to a resting place of her own selection.
The judge of the District Court was of this opinion and we have no doubt that he reached this conclusion because of the very obvious hostile attitude exhibited by the defendant to the plaintiff.
The judgment appealed from is affirmed at the cost of appellant.
Affirmed.